TAX COURT OF NEW JERSEY



**MARY SIOBHAN BRENNAN**
**JUDGE**

495 Martin Luther King Blvd., Fourth Floor
Newark, New Jersey 07102
609 815-2922, Ext. 54560
Fax: 609 815-3079

## NOT FOR PUBLICATION WITHOUT THE APPROVAL
## OF THE TAX COURT COMMITTEE ON OPINIONS

July 25, 2025

William Maslo, Esquire
City of Jersey City Law Department
280 Grove Street
Jersey City, New Jersey 07302

RM Holdings Jersey City LLC
222 ROCKAWAY TURNPIKE #3
Cedarhurst, New York 11516

  RE: CITY OF JERSEY CITY V RM HOLDINGS JERSEY CITY LLC
     Docket Number: 009966-2023

Dear Mr. Maslo and Representative of RM Holdings Jersey City LLC:

  This letter constitutes the Court's opinion issuing default judgment as it relates to a reverse/increase tax appeal. For the reasons set forth below, the Court issues default judgment in favor of plaintiff, City of Jersey City ("Municipality"), increasing the 2023 tax assessment of RM Holdings Jersey City LLC ("Defendant").

### I. Findings of Fact and Procedural History

  This tax appeal involves the assessment of land and improvements identified on the Jersey City tax map as Block 5103, Lot 1, with a street address of 178 Ogden Avenue ("Subject Property"). For the 2023 tax year, the Subject Property was






assessed at $2,888,900 in land and $13,971,200 in improvements, for a total assessment of $16,860,100. Applying the 2023 Chapter 123[1] average ratio (82.91%) results in an implied market value of $20,336,630.

The Subject Property consists of a 217,364 square foot lot improved by a five-story building located in a residential housing zone. The site is generally level and has approximately six hundred forty-two (642) feet of street frontage along Ogden Avenue, Franklin Street, and Mountain Road. There is a surface parking lot on-site.

Currently, the Subject Property is used as a skilled nursing facility[2] (also referenced as the "facility") including both private and semi-private units, known as

---

[1] After a revaluation, all assessments in a municipality must be set at 100% of true market value measured as of October 1st of the pre-tax year. The State Division of Taxation (the "Division") determines an equalization ratio (also known as the "average ratio") for any municipality that has a deviation in assessments from 100% of true market value. The equalization ratio represents the average relationship in any given year between the assessed values and the true market values of properties within the municipality, which is based upon the Division's annual analysis of relevant sales data. It is commonly referred to as "Chapter 123," based upon the enactment of Chapter 123 of P.L. 1973. The goal of Chapter 123 is to verify the fairness of tax assessments in New Jersey – specifically, to confirm that the relationship between the total assessment and the true market value of a property, as viewed as a ratio or percentage, is within an acceptable range (known as the "common level range") for the municipality. If it is not, then the current assessment is viewed as either too high or too low.

[2] A skilled nursing facility is defined as "a state-licensed nursing home that provides a wide range of services to meet the needs of both short-term rehabilitative and long-term patient care. Nursing facilities provide twenty-four-hour high skilled nursing care (i.e., a level of care just below acute hospital care)." APPRAISAL INSTITUTE, THE DICTIONARY OF REAL ESTATE APPRAISAL 216 (6th ed. 2015).

Optima Care at Harborview.  It houses one hundred eighty (180) beds in total and comprises approximately 72,000 square feet of gross living area.  Built in 1987, the facility has an unfinished basement, six elevators, individual heat and air conditioning units in each room, and offers laundry service, a salon, a day room and a concierge for its residents.

The Defendant purchased the Subject Property on December 30, 2021, for $60,000,000.

Pursuant to N.J.S.A. 54:3-21(a)(1), taxing districts which may feel discriminated[3] against by an assessed valuation of property in the taxing district, may, on or before April 1, file a complaint with the county board of taxation.[4] N.J.S.A. 54:51A-9 allows parties dissatisfied with the judgment of the Board to seek review of the judgment in Tax Court according to the procedures and time limits

---

[3] In the context of property tax appeals, "discrimination" refers to the situation where a property's assessed value is considered unfair or excessive when compared to other similar properties in the same municipality.  It essentially means that the assessed-to-market value ratio applied to a specific property is beyond the legally permitted range.  This standard recognizes that property values fluctuate over time due to various factors like inflation or depreciation after a revaluation or reassessment.  Therefore, the common level range is a permissible range within which assessed values can deviate from the true market value.  In New Jersey the common level range for a taxing district is generally plus or minus 15% of the average ratio for that district.  Chapter 123 establishes the annual ratios.

[4] Or directly with the Tax Court if the assessed valuation of the property subject to appeal exceeds $1,000,000.

determined by the Director of the Division of Taxation, which is forty-five (45) days.[5]

The Municipality filed a Verified Petition of Appeal with the Hudson County Board of Taxation ("Board") alleging that the Subject Property was underassessed for tax year 2023. On August 3, 2023, the Board issued a Memorandum of Judgment with Judgment Code #6B "Hearing Waived" affirming the $16,860,100 assessment. On August 28, 2023, the Board mailed a copy of the Memorandum of Judgment to the Municipality, with a copy to the Defendant at its address of 222 Rockaway TPKE #3, Cedarhurst, NY 11516.

On October 11, 2023, the Municipality timely filed a complaint with the Tax Court, appealing the Board's judgment and naming RM Holdings Jersey City LLC, the owner of record, as defendant. The complaint alleges discrimination and asserts that the assessment is below its true market value.

R. 8:5-3(a)(2) provides that a complaint by a taxing district to review the action of a County Board of Taxation shall be served on the County Board of Taxation and, if the action to be reviewed involves the assessment of a specific parcel

---

[5] Part 8 of the New Jersey Rules of Court govern the practice and procedure in all actions in the Tax Court. R. 8:1. The Tax Court has initial review jurisdiction of all final decisions of a county board of taxation. R. 8:2.

of property, on the taxpayer of said property and the assessor of the taxing district.

Furthermore, R. 8:5-4(3) states:

> Service upon a taxpayer in a local property tax matter shall be: (i) By personal service or by certified or registered mail, return receipt requested, upon the attorney who appeared for the taxpayer in the County Board of Taxation proceeding which resulted in the judgment contested in the complaint. (ii) If there was no attorney for the taxpayer in the County Board of Taxation proceeding which resulted in the judgment contested in the complaint or if the complaint is a direct appeal by a taxing district pursuant to N.J.S.A. 54:3-21, *service shall be made upon the taxpayer by personal service or by certified or registered mail, return receipt requested, and if by mail, at the address listed on the County Board of Taxation petition by the taxpayer, or if none, at the last known address as it appears on the last taxing district tax duplicate. (iii) Consistent with due process of law, service by mail pursuant to this subsection shall have the same effect as personal service, and the mailing shall constitute effective service unless the mail is returned undelivered by the Postal Service.* (iv) When service by certified or registered mail, return receipt requested, is not effected initially because the mail is returned undelivered, the party making service may make reservice simultaneously by certified or registered mail, return receipt requested, and ordinary mail, and if the addressee refuses to claim or accept delivery of the certified or registered mail and if the ordinary mail is not returned, the simultaneous mailing shall constitute effective service, and the additional time required for service shall not affect the validity of the complaint. (v) If service cannot be made by any of the modes provided by this rule, a taxpayer may be served as provided by court order, consistent with due process of law.
>
> R. 8:5-4(3) (emphasis added).

In New Jersey, real property is assessed to its owner.[6]   While it is well established that one need not be the owner of real property to be an aggrieved taxpayer entitled to initiate a tax appeal, this Court has determined that by virtue of holding title to the property, the owner maintains independent standing as an aggrieved taxpayer even in situations where other aggrieved taxpayers exist.  See B&D Assoc., Ltd. v. Twp. Of Franklin, 32 NJ Tax 81, 88-89 (Tax 2020).  Thus, it stands to reason that, in the absence of any other known aggrieved taxpayers, the Defendant, as the record owner, is the appropriate party in this appeal.[7]

On October 11, 2023, the Municipality served the complaint on Defendant via certified and ordinary mail at the address of record on the tax roll, pursuant to R. 8:5-4.  Neither the certified mail return receipt card nor the regular mail were returned.  Service was also effected upon the Hudson County Board of Taxation, the assessor for Jersey City, and the Clerk for Jersey City.

The Defendant designates itself as a limited liability corporation.  The New Jersey Court Rules provide that an entity other than a sole proprietorship, however formed and for whatever purpose, shall neither appear nor file any paper in any

---

[6] N.J.S.A. 54:4-23 provides, "[a]ll real property shall be assessed to the person owning the same on October 1 in each year."

[7] The expert report provided to the Court in support of default judgment refers to a lease, but nothing more.

action in the Tax Court except through an attorney authorized to practice in New Jersey. R. 8:3-3; R. 1:21-1(c).[8]

For this reason, on October 20, 2023, the Tax Court Management Office issued the following notice to the Defendant:

> An attorney must file a notice of appearance on the defendant entity's behalf within 30 days of the date of this notice, if you wish to oppose the relief sought in the above-captioned local property tax complaint. If you fail to have an attorney appear to represent your interests, the case may proceed without your participation and may result in a judgment adverse to your interests.

The notice was addressed to "RM HOLDINGS JERSEY CITY LLC 222 ROCKAWAY TURNPIKE #3 Cedarhurst, NY 11516," was sent by regular mail, and was not returned.

Our court rules provide that in local property tax cases, every defendant *may* but need not file an answer. R. 8:3-2(b) (emphasis added). In the present case, the Defendant did not respond to the complaint, did not respond to the notice sent by the Tax Court Management Office, has not had an appearance filed by an attorney, and no answer has been filed.

Based on the foregoing, on December 1, 2023, the Court issued an Order barring the Defendant from raising defenses for failure to appear in court or

---

[8] Except in the instance of limited liability partnerships for the practice of law.

otherwise comply with the notice issued by the Tax Court Management Office. The Order was sent by regular mail to the Defendant. It was not returned.

Subsequently, multiple hearings were scheduled and adjourned. All Orders and notices were sent to the Defendant at the name and address of record in Cedarhurst, New York. Two Court mailings in 2025 were returned to the Court marked "Return to Sender – Not Deliverable as addressed – Unable to forward."

On June 24, 2025, the Jersey City tax collector certified that the owner of record was still RM Holdings Jersey City, LLC, with a mailing address of 222 Rockaway TPKE #3, Cedarhurst, NY 11516. The tax collector further certified that all correspondence from the tax collector's office, including but not limited to property tax bills are sent to that address, and that to date all property tax payments have been remitted.

The Court finds that the Municipality has identified the appropriate party/defendant, and it has met the pleadings and proof of service requirements mandated by the court rules. The Court will now proceed to resolution of the consequences of Defendant's nonappearance, and the merits of the Municipality's tax appeal.

There is no provision in Rule 8 for default in a local property tax appeal. In certain circumstances, Rule 8 adopts provisions from Rule 4 governing civil

8

practice,[9] however the default provisions of Rule 4 are not applicable here because they contemplate the mandatory filing of an answer by the defendant.

In the absence of a default provision, the Court proceeds to default judgment. R. 8:8-4(b)-(c) states that in the absence of an appearance by a defendant, the court may proceed to hear the matter and take such other action as authorized by R. 1:2-4(a) as it shall deem appropriate. R. 1:2-4(a) provides that if without just excuse or because of failure to give reasonable attention to the matter, no appearance is made on behalf of a party on the call of a calendar, on the return of a motion, at a pretrial conference, settlement conference, or any other proceeding scheduled by the court, or on the day of trial, the court may order the striking of the answer and the entry of judgment by default.

---

[9] R. 8:2 conferring jurisdiction to the Tax Court pursuant to R. 4:3-4(a) for matters with issues as to which expertise in taxation is desirable; R. 8:3-4 referencing R. 4:57 regarding contents of a complaint; R. 8:3-6 requiring that an Answer filed in Tax Court conform to the requirements of R. 4:5-3; R. 8:3-8 requiring that amendments to conform to the evidence be permitted in accordance with R. 4:9-2; R. 8:4-3 specifying the time for filing of all pleadings other than the complaint be prescribed by R. 4:6-1; R. 8:5-4 requiring that service of the Complaint be made personally or by certified or registered mail , return receipt requested, as provided in R. 4:4-4; R. 8:6-1(a) stating that discovery may be taken in accordance with the provisions of R. 4:10-1 through R. 4:18-2 and R. 4:22 through R. 4:25; R. 8:6-3 adopting the provision of R. 4:23-5 relating to discovery; R. 8:7 with respect to the governing provision of R. 4 with respect to motions; R. 8:9-1 referencing R. 4:42-1 regarding form of judgment; R. 8:10 referencing R. 4:49-1 (motions for new trials) and R. 4:49-2 (motion to alter or amend a judgment or final pleading).

R. 8:8-1 allows the court to exercise its discretion to hear a tax appeal by submission and without trial. The Court has reviewed the Municipality's evidentiary submissions and is satisfied that the evidence is adequate, and that in the absence of rebuttal or contradiction, it is sufficient to allow the determination of default judgment to proceed by submission and without hearing. The Court set July 25, 2025, as the date for determination with notice to both parties. The mailed notice for the date of determination was not returned to the Court.

## II. Analysis of Evidence

To prove its claim that the Subject Property is underassessed, the Municipality must provide the court with evidence to indicate a true market value exceeding the Chapter 123 Lower Limit ratio of 70.47%, which results in an implied market value of $23,925,216.

In support of its request for default judgment, the Municipality submitted the certified appraisal report of a certified real estate appraiser ("Expert"). The Expert currently serves as the Tax Assessor for both Wall Township and the Borough of Manasquan and is a Director at the Associated Appraisal Group. The Expert has qualified as an expert witness in the field of real estate appraisal in many courts, including this Court, and he is also a State certified appraiser in New Jersey and Pennsylvania, and is an associate member of the Appraisal Institute.

The Expert inspected the Subject Property on March 12, 2024,[10] and prepared a report dated March 28, 2025, summarizing the data considered and basis for his value conclusion. After reviewing the zoning regulations, interviewing staff of the nursing facility to ascertain the quality and condition of the Subject Property, reviewing long term senior housing market activity, and the surrounding neighborhood, the Expert found that the Subject Property's highest and best use, as improved, was consistent with its continued use as a skilled nursing facility. The Expert also concluded that the highest and best use of the Subject Property, if vacant, would be for commercial development consistent with zoning regulations.

When initiating the appraisal on the Subject Property, the Expert considered the three appraisal methods: the Sales Comparison Approach; the Income Capitalization Approach; and the Cost Approach. The Sales Comparison Approach was not utilized due to the lack of market reflective sales data in the subject market and due to the difficulty in segregating the real property, personal property, tangible and intangible assets included in the sale. Although the Subject Property is leased, the Income Approach was not utilized due to the lack of leases of skilled nursing

---

[10] The Expert conducted an exterior site inspection. The tax assessor and staff conducted an interior inspection of the Subject Property on April 4, 2023, photos from which were provided to and reviewed by Expert to ascertain the quality and condition of the Subject Property at that time.

facilities and due to the difficulty in segregating the real property, personal property, tangible and intangible assets in capitalization of the going concern.

The Expert utilized the Cost Approach because skilled nursing facilities are limited market, special-purpose properties. In addition to utilization of the Cost Approach in valuing the Subject Property's improvement, the Expert also relied on the Sales Comparison Approach to measure the market value of the land.

The Court finds that the Cost Approach methodology is an appropriate valuation method for the Subject Property due to its unique and special-purpose improvement, and that utilization of the Sales Comparison Approach in estimating market value of the land of the Subject Property is also appropriate.

The Cost Approach estimates property value by calculating the cost to replace or reproduce the improvement on the property and a separate value for the land from scratch, considering construction costs, and any accrued depreciation.

For the land value, while physically joined and combined for purposes of market sales and rental data, land and improvements require separate values. Appraisers, when distinguishing between the improvement and the land itself, can use several techniques to measure value, including sales comparison, extraction, allocation, subdivision development, land residual, and ground rent capitalization. Since the Subject Property is a skilled nursing/ assisted living facility, sales of land

purchased to develop continuing care/assisted living/ nursing home facilities were considered for analysis to estimate land value.

The Sales Comparison approach requires recent sales similar to the Subject Property, preferably in a nearby location. The approach necessitates that all listings, offerings, and rental data be considered as factors that could affect current market conditions. While each sale is analyzed and compared to the Subject Property, adjustments are made where comparable properties are dissimilar to the subject in aspects including location, time of sale, size of lot, and condition, to name a few. The goal is to make each sale nearly equal to the subject, narrowing the subject to a value range supported by sound and reasonable comparisons.

Numerous comparable land sales were considered for analysis. The land sales selected were considered to be the most comparable in order to estimate the market value of the Subject Property. The selected sales reflected unit prices ranging from $19,509 to $53,500 per bed prior to adjustments. The sales span a forty-seven month period from January 2019 to August 2021.

The five (5) sales chosen are listed below:

Comparable Sale 1

| Address (County) | 147 Grant Avenue, Eatontown (Monmouth) |
|---|---|
| Sale Date / Effective Sale Price | 2019 / $1,326,595 |
| Beds / Units | 68 |
| Price per Unit | $19,509 |
| Location / Adjustment | Inferior / 20% |
| Development / Adjustment % | Contingent / 15% |
| Net Adjustment | 35% |
| Adjusted Unit Price | $26,337 |
| Notable Comments | The property was purchased contingent upon the buyer obtaining approvals for new assisted living / memory care facility comprising of 36,777 sq. ft. with 68 units and 68 total beds. At the time of the sale, there were two residential dwellings, a garage, inground pool and concrete patio. Demolition costs were estimated at $50,000 (included in the effective sale price). |

Comparable Sale 2

| Address (County) | 212 Passaic Ave, Fairfield (Essex County) |
|---|---|
| Sale Date / Price | 2019 / $1,700,000 |
| Beds / Units | 80 |
| Price per Unit | $21,250 |
| Location / Adjustment | Inferior / 20% |
| Development / Adjustment % | Similar / 0% |
| Net Adjustment | 20% |
| Adjusted Unit Price | $25,500 |
| Notable Comments | Property was purchased with approvals in place.  Application was made to the zoning board and variances were granted: use, FAR, building height, parking, loading area, etc.  Utilizing an easement in a separate lot as well as its pre-existing 2-way access driveway. |

Comparable Sale 3

| Address (County) | 290 South Orange Avenue, Livingston (Essex) |
|---|---|
| Sale Date / Price | 2019 / $4,020,000 |
| Beds / Units | 122 |
| Price per Unit | $32,951 |
| Location / Adjustment | Inferior / 10% |
| Development / Adjustment % | Contingent / 15% |
| Net Adjustment | 25% |
| Adjusted Unit Price | $41,188 |
| Notable Comments | Property purchase was contingent upon the buyer obtaining approvals for new assisted living / memory care facility compromising of 68,286 sq. ft. with 103 units and 122 total beds. |

Comparable Sale 4

| Address (County) | 5 Executive Drive, Evesham (Burlington) |
|---|---|
| Sale Date / Price | 2021 / $2,802,650 |
| Beds / Units | 110 |
| Price per Unit | $25,479 |
| Location / Adjustment | Inferior / 15% |
| Development / Adjustment % | Contingent / 15% |
| Net Adjustment | 30% |
| Adjusted Unit Price | $33,122 |
| Notable Comments | Property was purchased contingent upon the buyer obtaining development approvals for new assisted living / memory care facility comprised of 87 units and 110 total beds. |

Comparable Sale 5

| Address (County) | 602 Pascack Road, Washington Twp. (Bergen) |
|---|---|
| Sale Date / Price | 2021 / $5,350,000 |
| Beds / Units | 100 |
| Price per Unit | $53,500 |
| Location / Adjustment | Inferior / 5% |
| Development / Adjustment % | Contingent / 15% |
| Net Adjustment | 20% |
| Adjusted Unit Price | $64,200 |
| Notable Comments | Property was purchased contingent upon the buyer obtaining development approvals for new assisted living / memory care facility comprised of 85 units and 100 total beds. At the time of sale, the property was improved with a tennis club. |

Adjustments were made for date of sale, financing/ terms of sale, location, age/condition, and other discernible physical characteristics. Because comparable sales one, three, four, and five were sold contingent upon the buyer obtaining development approvals, adjustments upward were necessitated to accurately compare the sales to the Subject Property. After applying adjustments, the sales reflect unit prices ranging from $25,580 to $64,200 per bed. The Expert concluded that the market value of the land was $55,000 per bed as of October 1, 2022. In

applying the adjusted unit price to the Subject Property, the Expert concluded that the land ought to have been valued at $9,900,000.

To this value estimate must be added the depreciated value of the improvement on the Subject Property. Depreciation may come from actual and/or physical deterioration, loss in value due to financial inutility, or through a loss in value resulting from economic reasons such as factors in the marketplace which would cause the property to rent for an amount not adequate to justify the investment in the improvements.

Employing the Marshall and Swift cost estimator,[11] the Expert was able to estimate the cost of the construction of the improvement and fixtures, development costs, as well as the life expectancy of the improvement itself and any depreciation that ought to be considered. As part of his final calculations, the Expert found that the facility's replacement cost would be valued at $39,888,380. To this, the Expert applied a 3% contingency value of $1,246,652, a 16% soft cost value of $5,185,489, and a 10% entrepreneurial profit of $4,627,052. Finally, the Expert deducted a 20%

---

[11] The Marshall Valuation Service, offered by Marshall & Swift, is an appraisal guide for determining building replacement costs, depreciated values, and insurable values. It is a widely used resource for professionals in real estate, insurance, and finance, providing detailed cost data for a wide range of construction types and occupancies. The Appraisal Institute lists it as one of the most recognized services in the United States. APPRAISAL INSTITUTE, THE APPRAISAL OF REAL ESTATE, 544 (15th ed. 2020).

depreciation value of $10,179,515 and concluded that the total value of the improvement on the Subject Property as of October 1, 2022, is $40,718,000.

Tallying the total improvement value and the land value together, the Expert concluded that the value of the Subject Property, using the Cost Approach was $50,618,000 as of October 1, 2022.

### III. Legal Analysis

The Court begins its analysis with the well-established principle that "[o]riginal assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Mountain Lakes Borough, 18 N.J. Tax 364, 373 (Tax 1998); see also Byram Twp. v. Western World, 111 N.J. 222 (1988) (stating "[w]hile a municipality's original assessment is entitled to a presumption of validity, this presumption attaches to the assessment of the County Board when it is the determination of that body that is challenged before the Tax Court.").

The presumption of correctness is not a mere evidentiary mechanism used solely to allocate the burden of proof. Pantasote Co. v. City of Passaic, 100 N.J. 408, 413 (1985). Rather, the presumption expresses the view "that in tax matters it is to be presumed that governmental authority has been exercised correctly and in accordance with law." Ibid. (citing Powder Mill, I Assocs. v. Township of Hamilton, 3 N.J. Tax 439 (Tax 1981)).

In determining whether the presumption of correctness has been overcome, the court should weigh and analyze the evidence employing the evidentiary standard that evidence must be "definite, positive and certain in quality and quantity to overcome the presumption." Pantasote Co., 100 N.J. at 413 (quoting Aetna Life Ins. Co. v. Newark, 10 N.J. 99, 105 (1952)). In order to overcome the presumption, the evidence "must be 'sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.'" West Colonial Enters., LLC v. City of East Orange, 20 N.J. Tax 576, 579 (Tax 2003) (quoting Lenal Props., Inc. v. City of Jersey City, 18 N.J. Tax 405, 408 (Tax 1999), aff'd, 18 N.J. Tax 658 (App. Div. 2000), certif. denied, 165 N.J. 488 (2000)).

The Court finds that the Municipality produced sufficient cogent evidence to overcome the presumption of validity attached to the assessment on the Subject Property. The Court concludes that the Municipality has raised a debatable question regarding the correctness of the assessment. The Municipality identified five comparable sales and included necessary adjustments to make each sale and comparable property as close to identical to the Subject Property.

Having found the presumption of correctness overcome, the Court must determine the true market value of the Subject Property as of October 1, 2022, based on the evidence in the record.

Courts have recognized that in the context of a default judgment, the burden of proof is less than the civil trial standard of "preponderance of the evidence," and the Court is not to engage in a "weighing" of the evidence. Instead, a plaintiff must adduce proofs which demonstrate that the facts alleged "might have been the case" or that they could conceivably be proved at trial, and that, if proved, they would establish the legally required elements of plaintiff's claim for relief. Heimbach v. Mueller, 229 N.J. Super. 17, 23 (App. Div. 1988).

When determining default judgment, it is recognized that a trial court imposing a preponderance standard may be imposing too heavy a burden on a plaintiff and giving an improper benefit of the doubt as to every issue to the defaulted defendant. Fairness dictates that judgment may only be denied after a defendant's default where a court finds that some necessary element of plaintiff's prima facie case was missing or because plaintiff's claim was barred by some rule of law whose applicability was evident either from the pleadings or the evidence presented. Heimbach, 229 N.J. Super. at 23-24. A court should ordinarily only apply the prima facie standard to plaintiff's evidentiary submissions or hearing, thus not weighing evidence or finding facts but only determining bare sufficiency. See Kolczycki v. City of East Orange, 317 N.J. Super 505, 514 (App. Div. 1999).

The Court now considers the evidence in the record.

The Municipality's evidence of value relies upon application of the Cost Approach. The Cost Approach consists of "two elements – land value and the reproduction or replacement cost of the buildings and other improvements." International Flavors and Fragrances, Inc. v. Union Beach Borough, 21 N.J. Tax 403, 417 (Tax 2004). The Cost Approach is an effective valuation method when the property being appraised is new or when the site improvements are unique and designed for a special purpose. APPRAISAL INSTITUTE, THE APPRAISAL OF REAL ESTATE, 530 (15th ed. 2020). A special purpose property typically possesses some, or all, of the following characteristics: "(1) unique and specially built for the purpose for which they are used, (2) without a market or comparable sales, (3) unlikely to be converted without substantial economic expenditure, and (4) reasonably expected to be replaced or reproduced if destroyed." TD Bank v. City of Hackensack, 28 N.J. Tax 363, 379 (Tax 2015).

The Court finds that the Expert appropriately concluded that the Subject Property is a special purpose property and that the Cost Approach was the most effective method in determining market value as of October 1, 2022.

After careful consideration of the record, the Court finds the Expert's opinion of the Subject Property's true market value credible and supported by the evidentiary record. His comparable sales, although not from sites within Hudson County, were all similar use properties and are sales which occurred between 2019 and 2021. His

23

analysis contains appropriate adjustments to the sales prices of the comparable sales and appropriate estimates of the cost to replace or reproduce the improvement on the land.

The Court finds the true market value of Block 5103, Lot 1 as of October 1, 2022, to be $9,900,000 for the value of the land, and $40,718,000 for the improvement, totaling $50,618,000. The Municipality has proven its claim that the Subject Property is underassessed, as this value exceeds the 2023 Chapter 123 Lower Limit ratio value of 70.47%, with an implied market value of $23,925,216.

With regard to the issue of discrimination, the requirement of equal treatment is mandated by the New Jersey Constitution, which specifies that all property be assessed for taxation under general laws, by uniform rules and in accordance with a single standard of value. N.J. Const. art. 8, § 1(1). If such equal treatment is not given to the taxpayer, the taxpayer is entitled to judicial relief. Piscataway Assoc., v. Piscataway Twp., 73 N.J. 546, 556 (1977). Relief from such assessment discrimination is governed by Chapter 123, originally enacted as 1973 N.J. Laws ch.123. That part of Chapter 123 which applies to proceedings in the Tax Court is found in N.J.S.A. 54:51A-6 and it provides:

> a. Whenever the tax court is satisfied by the proofs that the ratio of the assessed valuation of the subject property to its true value exceeds the upper limit or falls below the lower limit of the common level range, it shall enter judgment revising the taxable value of the property by applying the

24

average ratio to the true value of the property except as hereinafter provided.

b. If the average ratio is below the county percentage level and the ratio of the assessed value of the subject property to its true value exceeds the county percentage level, the tax court shall enter judgment revising the taxable value of the property by applying the average ratio to the true value of the property.

c. If both the average ratio and the ratio of the assessed value of the subject property to its true value exceed the county percentage level, the tax court shall enter judgment revising the taxable value of the property by applying the county percentage level to the true value of the property.

d. The provisions of this section shall not apply to any proceeding to review an assessment of real property taken with respect to the tax year in which the taxing district shall have completed and put into operation a district-wide revaluation program approved by the Director of the Division of Taxation pursuant to P.L.1971, c. 424 (C. 54:1-35.35 et seq.), district-wide reassessment program, compliance plan, or other form of municipal-wide assessment review that requires the revision of all property assessments to current market value, that is approved by the county board of taxation pursuant to R.S.54:4-23.

N.J.S.A. 54:51A-6.

Discrimination, within the context of local property taxation, arises when a taxpayer's property is assessed at a value that results in an effective tax rate inconsistent with the standard required by law. In non-revaluation years, when Chapter 123 applies, an assessment may be increased if the Tax Court finds that the ratio of assessed to true value falls below the lower end of the common level range. In these circumstances, the underassessment means the taxpayer is remitting less

than their proportionate share of the municipal tax burden, effectively shifting a greater obligation onto other property owners.

A common argument posited by taxpayers in response to municipal claims of underassessment is that the municipality does not experience a tangible loss because of a single underassessment. Because municipal budgets are funded in full, their argument continues, any shortfall attributable to a particular property necessarily results in a marginally increased share borne by the remainder of the taxpayers. In this way, the municipality itself is always made whole, while the remaining constituents absorb the difference created by the underassessment.

However, such reasoning misconstrues the role and nature of the municipality in the tax context. A municipality exists not as a profit-seeking beneficiary but as a collective body acting on behalf of its residents and taxpayers. The constitutionally enshrined principle, and the mandate of the Tax Court, is to ensure that each taxpayer pays no more and no less than their lawful portion of the municipal budget. If a property is underassessed, the resultant deficit, though initially abstract at the municipal level, is in reality absorbed by the other property owners of the same municipal body who are thus compelled to pay more than their fair share.

To accept the proposition that a municipality cannot suffer discrimination in cases of underassessment would render worthless the statutory and constitutional mechanisms that permit municipalities to challenge inequitable assessments. It

would negate the legislative grant permitting reverse appeals by municipalities and compromise the integrity of the equitable taxation system.

Therefore, this Court holds that discrimination is established where the municipality demonstrates, through evidence and application of Chapter 123, that a property is underassessed to the detriment of other taxpayers. In so holding, this Court affirms its charge to safeguard the principle of tax uniformity, ensuring that no individual taxpayer's burden is unjustly shifted to others.

IV. <u>Conclusion</u>

The Municipality has proven its claim that the Subject Property is underassessed, as this value exceeds the 2023 Chapter 123 Lower Limit ratio value of 70.47%, with an implied market value of $23,925,216.

Applying the Chapter 123 Average ratio of 82.91%, the Court finds an assessment value for the 2023 tax year to be $41,967,383, which the Court will round to $41,967,000.

Accordingly, a judgment revising the Subject Property's 2023 tax year assessment will be entered as follows:

Block 5103, Lot 1

Land:               $  8,208,000
<u>Improvement:      $ 33,759,000</u>
Total:              $ 41,967,000

Contemporaneously with the issuance of this letter opinion, the Court shall

enter the above-referenced judgment.

/s/ Mary Siobhan Brennan

Hon. Mary Siobhan Brennan, J.T.C.
